UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Oneal Johnson, | |
| *Plaintiff,* | No. 21 CV 738 |
| v. | Judge Lindsay C. Jenkins |
| Ryan Edwards, *et al.*, | |
| *Defendants.* | |

MEMORANDUM OPINION AND ORDER

Plaintiff Oneal Johnson was walking home late one night when he encountered an active crime scene. Police told him that he could not cross the crime scene and eventually said that if Johnson did not walk away, he would be arrested. The police interpreted a comment Johnson made as a refusal to leave and arrested him. Aggrieved, Johnson refused a seatbelt, despite having his hands cuffed behind his back, and the police did not insist on using one. En route to the police station, the driver braked abruptly, causing Johnson to hit his head and lose consciousness. Johnson filed this lawsuit against four officers, Timothy Balasz, Ryan Edwards, Monica Mata, and Dennis Hecker Jr. ("Defendants"). Defendants move for summary judgment. [Dkt. 104.] For the reasons stated below, the motion is granted.

## I. Background

The Court draws on the parties' Local Rule 56.1 filings, noting where facts are in dispute. Body-worn camera and in-car camera footage captures the events at issue, so the Court relies on video evidence to the extent that it supplies a definitive record

of what occurred. *Cf. Kailin v. Village of Gurnee*, 77 F.4th 476, 480–81 (7th Cir. 2023) (discussing when relying on video evidence at summary judgment is appropriate).

On April 19, 2021, at around 3:00 a.m., Johnson was at 75th Street and Champlain Avenue in Chicago. [Dkt. 106 ¶¶ 1–2.] Defendants—Sergeant Balasz and Officers Edwards, Mata, and Hecker—were in the same area with other Chicago Police Department ("CPD") personnel, investigating a shooting. [*Id.* ¶ 3.] The crime scene was marked by police tape, and the investigation was active. [*Id.* ¶¶ 3, 7.] Johnson encountered the police near the crime scene, and several officers' body-worn cameras captured the events that ensued. [*Id.* ¶¶ 4–5; Dkt. 123 ¶ 4.] Edwards and Hecker's patrol car was also equipped with a camera. [Dkt. 106 ¶ 6.]

The parties dispute whether Johnson breached the outer perimeter of the crime scene tape [*id.* ¶ 8, Dkt. 123 ¶ 8], but this dispute is immaterial. The police said Johnson could not cross the crime scene and Balasz ordered him to go another way. [Dkt. 106 ¶¶ 9–14.] Things became heated, but a blow-by-blow of each remark is unnecessary. Suffice it to say that Johnson yelled at the officers and used racial slurs; some officers did their fair share of yelling too. [*Id.* ¶¶ 15–16; Dkt. 123 ¶¶ 15–16.]

The key events came next. The Court recounts them as depicted in Exhibit 3A, footage from one of several body-worn cameras that recorded crisp video and audio. [Dkt. 125 (fifth link) at 0:45–1:18.] Johnson walked backward while saying, "Get your goofy ass out of here. You motherf*****." In unison, officers told Johnson, "Start walking, start walking." When he was several paces away from the officers, he said, "You don't tell me shit." An officer responded, "That's why you're walking backward."

Pointing in the direction of the crime scene, Johnson said, "I work for waste man[agement], and I'm trying to go that way." An officer stepped toward Johnson and was roughly eight feet way, while another officer said, "Go, go somewhere else." Johnson: "[inaudible] your white ass," to which another officer said, "Get the f*** out of here or you're going to jail, period." Johnson gestured behind himself, away from the crime scene, saying, "I'm going the other way." An officer says, "Walk, walk." Johnson said, "But I'm gonna check you bitches in the door before I go, so I ain't trying to go that way, brother." While Johnson was making this statement, officers closed in and arrested him for disorderly conduct.

Hecker, Mata, and another officer then placed Johnson into a patrol car. [Dkt. 106 ¶ 21.] The Court again relies on Exhibit 3A. [Dkt. 125 (fifth link) at 2:00–3:32.] When Johnson realized he was going to be put into the patrol car, he said, "I'm not going into there. Why I got to go into there now?" Johnson objected as officers searched his pockets, then, as he was being led to the open car door, said, "Don't f****** put your hands on me. I'm going to get in, let me get in when this big, Black mother****** can get in right! Don't push me in there, boy!" The officers agreed, and Johnson continued to complain about their behavior. Mata guided Johnson into the car, saying, "Don't hurt your head," then after he was in the car: "I'm trying to help you out here, put your leg up." Johnson responded, "I'm going to help you out too, sister." Mata said, "Help me out," but Johnson changed tack: "But I'm not 'cause I don't like you, and I ain't going to lie." As Mata attempted to fasten Johnson's seatbelt, he said, "I don't need that, get that shit off around me." Mata asked if he

wanted a seatbelt; Johnson replied, "Hell no! Get that shit off . . . ." Mata then said, "You are, you're a big, ugly-ass motherf*****." Johnson retorted, "You're an ugly bitch," after which Mata and another officer closed the door. The parties dispute why the officers did not make more of an effort to fasten Johnson's seatbelt, but the video makes clear that Mata made only one attempt to do so, and the others did not assist with that attempt. [*See also* Dkt. 106 ¶¶ 22–25; Dkt. 123 ¶¶ 22–25; Dkt. 130 ¶¶ 57–59.]

Edwards and Hecker then transported Johnson to the police station, with Hecker driving. [Dkt. 106 ¶ 27.] The in-car camera was recording, but the quality of the video is considerably worse than the officers' body-worn cameras. The Court relies on this recording, labeled Exhibit 3E [Dkt. 125 (seventh link) at 42:27–48:15], to the extent possible, but it is far from definitive in many respects. *Cf. Kailin*, 77 F.4th at 480–81. Therefore, the Court describes the disputed facts in the light most favorable to Johnson, the nonmovant. *See Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013). Johnson disputes Defendants' assertion that Hecker "drove in the same manner he would have driven with an arrestee who was seat belted"; that he drove "safely, obeying the speed limit, and assessing the environment around him"; and that he "drove at a reasonable speed, navigated numerous red lights and stop signs, and slowed and stopped when necessary." [Dkt. 106 ¶¶ 28–30; Dkt. 123 ¶¶ 28–30.] Instead, Johnson argues that Hecker's driving was unsafe, noting that Hecker drove through red lights and made rolling stops at or drove through stop signs, which Defendants dispute. [Dkt. 130 ¶¶ 61–62, 64–72.] These disputes are not material.

The record indisputably shows that as Hecker drove to the police station, Johnson spoke and complained from the back seat, sometimes apparently talking to himself and at other times appearing to talk to the officers. [Dkt. 125 (seventh link) at 42:27–45:00.] About two and a half minutes into the trip, he asked Hecker to slow down, and made a remark about the tightness of his handcuffs. [*Id.* at 45:00–:10.][1] As Hecker neared a red light at the intersection at 75th Street and Vincennes, he braked harder than he had at prior intersections, causing Johnson to hit his head on the plexiglass divider in the patrol car. [*Id.* at 45:10–:11.][2] Johnson cried out, made a few more noises, and then fell silent for the remainder of the ride; Hecker said, "I'm sorry." [*Id.* at 45:11–:20.] Hecker continued to drive for about two and a half minutes until he reached the police station and parked the car. [*Id.* at 45:20–48:15.]

At the police station, officers soon realized that Johnson was nonresponsive, as depicted in Exhibit 2C, a body-worn camera. [Dkt. 125 (third link) at 0:30–1:45.] About 45 seconds after parking the car, Edwards and Hecker observed that Johnson was nonresponsive and attempted to rouse him. [*Id.* at 0:30–:50; *see* Dkt. 125 (seventh link) at 48:15–49:00 (in-car camera showing that 45 seconds elapse between Hecker parking the car and the officers beginning to attempt to rouse Johnson).] Less than a minute later, Hecker stated that Johnson might need to go to the hospital, and he and Edwards summoned medical attention. [Dkt. 106 ¶ 34; Dkt. 123 ¶ 34; Dkt. 125 (third link) at 0:50–1:36.] They left Johnson in the car. [Dkt. 125 (third link) at 1:45.]

---

[1] The parties dispute whether Johnson asked Hecker to slow down more than once and why he asked Hecker to slow down. [Dkt. 130 ¶ 60.] This dispute is immaterial.

[2] Defendants note that Hecker did not testify that Johnson hit his head, so the point is not undisputed. [Dkt. 130 ¶¶ 74–75.] But a jury could certainly make this finding.

About four minutes later, Johnson seemed to regain consciousness, and he began to demand to be let out of the car. [Dkt. 125 (seventh link) at 53:33.] Roughly 30 seconds later, officers opened the door. [*Id.* at 54:08.] As captured by Exhibit 4D, a body-worn camera, Johnson indicated that he wanted to be seen by a doctor, and officers informed him that medical personnel were on the way. [Dkt. 125 (ninth link) at 0:30–1:00; *see* Dkt. 106 ¶ 38; Dkt. 123 ¶ 38.] First responders from the Chicago Fire Department arrived minutes later. [Dkt. 125 (ninth link) at 5:45.] Johnson refused treatment on site and insisted on going to the hospital; he was taken by ambulance to St. Bernard Hospital, where he was diagnosed with a lip laceration. [Dkt. 106 ¶¶ 44–47.] Johnson later testified that he received additional treatment for injuries to his hands, lip, neck, and lower back, and that he suffered numbness in his hands as a result of the events surrounding his arrest. [Dkt. 130 ¶¶ 78–80.]

The disorderly conduct charges against Johnson were dropped. [Dkt. 110 at 3.] It is undisputed that no Defendant knew Johnson prior to their encounter with him on April 21, 2019 or spoke with prosecutors about the criminal case. [Dkt. 106 ¶¶ 48, 50; Dkt. 123 ¶¶ 48, 50.][3] However, CPD disciplined Hecker and Edwards for actions they took that night. CPD policy "requires that arrestees be seat belted, absent exigent circumstances"; Hecker was disciplined "for failing to properly secure

---

[3] Johnson responded to paragraph 50 of Defendants' Local Rule 56.1 statement, which states that Defendants did not speak to prosecutors in connection with the criminal case, with a single word: "Denied." [Dkt. 106 ¶ 50; Dkt. 123 ¶ 50.] But to dispute an asserted fact under Local Rule 56.1(e)(3), "a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." Therefore, the facts asserted in paragraph 50 are deemed admitted.

arrestee in the squad car with safety belt." [Dkt. 123 ¶¶ 56, 81 (cleaned up).] Edwards was disciplined "for failing to keep arrestee under constant observation during transport." [*Id.* ¶ 82 (cleaned up).]

Johnson filed this lawsuit in February 2021 and filed the operative Amended Complaint in March 2023. [Dkt. 91.] Johnson asserts four claims for violations of 42 U.S.C. § 1983: false arrest against all four Defendants, state-created danger against Hecker and Mata, excessive force against Hecker, and failure to provide adequate medical care against Edwards and Hecker. [*Id.*] He also brings a malicious prosecution claim under Illinois law against all four Defendants. [*Id.*][4] Defendants now move for summary judgment. [Dkt. 104.]

## II.    Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323, (1986). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors*, 714 F.3d at 532 (citation omitted).

---

[4]    The operative Amended Complaint asserts claims against "Other Unknown Police Officers" [Dkt. 91 at 1], but Johnson did not identify those officers in discovery, so the Court dismisses any claims against them for failure to prosecute. *See Martin v. Noble Cnty. Sheriff's Dep't*, 2021 WL 5505407, at *1 (7th Cir. Nov. 24, 2021) (per curiam).

The existence of video evidence capturing the events at issue usually does not change the applicable standard. An exception is when one party's account "is blatantly contradicted by the record, so that no reasonable jury could believe it," in which case "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). But the Seventh Circuit has emphasized that this "is a narrow pragmatic exception"— video footage "can eviscerate a factual dispute only when the video is so definitive that there could be no reasonable disagreement about what the video depicts." *Kailin*, 77 F.4th at 481 (cleaned up).

## III. Federal Claims

Johnson's first four claims arise under 42 U.S.C. § 1983 for alleged violations of his constitutional rights. Prevailing on these claims requires Johnson to overcome qualified immunity, which shields government officials from liability for damages in their personal capacity unless they violate clearly established law. *Tousis v. Billiot*, 84 F.4th 692, 697 (7th Cir. 2023). Qualified immunity requires the Court to ask two questions: (1) "whether the facts, taken in the light most favorable to the party asserting the injury show that the officer's conduct violated a constitutional right," and (2) "whether the right at issue was clearly established at the time of the officer's alleged misconduct." *Id.* (cleaned up). Qualified immunity is a question of law, *Smith v. Finkley*, 10 F.4th 725, 734 (7th Cir. 2021), and the Court may consider these questions in either order, *Tousis*, 84 F.4th at 697.

The first qualified immunity question goes to the merits of the plaintiff's claim. The second question, whether the right is clearly established, requires it to be

"sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Stockton v. Milwaukee County*, 44 F.4th 605, 620 (7th Cir. 2022) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). There are three routes to showing that a right is clearly established:

> First, by identifying a closely analogous case finding the alleged violation unlawful. Second, by identifying in the relevant caselaw such a clear trend ... that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time. ... [T]hird ..., reserved for rare cases, arguing that [the defendant's] conduct was so egregious and unreasonable that no reasonable official could have thought he was acting lawfully.

*Id.* at 620–21 (cleaned up). "Qualified immunity is an affirmative defense, but once the defendant raises it, the burden shifts to the plaintiff to defeat it." *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021) (cleaned up).

As explained below, Defendants are entitled to summary judgment on each of Johnson's claims, on the merits or because he has not overcome qualified immunity.

## A.    False Arrest

Count I alleges that all four Defendants arrested Johnson without probable cause in violation of the Fourth Amendment. [Dkt. 91 ¶¶ 11–22.] Defendants contend that Count I fails because they had probable cause to believe that Johnson had committed a crime or because qualified immunity shields them from liability. [Dkt. 110 at 4–5, 13–14.] The undisputed facts establish that Defendants had at least arguable probable cause, so they are entitled to qualified immunity.

"To prevail on a Fourth Amendment false-arrest claim, a plaintiff must show that there was no probable cause for his arrest. Put slightly differently, the existence of probable cause to arrest is an absolute defense to any § 1983 claim against a police

officer for false arrest." *Braun v. Village of Palatine*, 56 F.4th 542, 548 (7th Cir. 2022) (cleaned up). "Probable cause to arrest exists when the facts and circumstances that are known to the officer reasonably support a belief that the individual has committed, is committing, or is about to commit a crime." *Doe v. Gray*, 75 F.4th 710, 718 (7th Cir. 2023) (cleaned up). Probable cause "is not a high bar and requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* at 718–19 (cleaned up). "The probable cause inquiry is purely objective, and the officer's subjective state of mind and beliefs are irrelevant." *Pierner-Lytge v. Hobbs*, 60 F.4th 1039, 1043 (7th Cir. 2023) (cleaned up). A police officer enjoys qualified immunity from a false arrest claim if he has "arguable probable cause— meaning that a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law." *Mwangangi v. Nielsen*, 48 F.4th 816, 825 (7th Cir. 2022) (cleaned up). If so, the Court "cannot say that the officer violated the plaintiff's clearly established constitutional rights." *Id.* (citations omitted).

"The existence of probable cause depends, in the first instance, on the elements of the predicate criminal offense(s) as defined by state law." *Doe*, 75 F.4th at 719 (cleaned up). Here, the relevant offense is disorderly conduct in violation of Chicago Municipal Code § 8-4-010, which provides:

> A person commits disorderly conduct when he knowingly: …
>
> (e) Fails to obey an order by a peace officer, traffic control aide, fire department official, or other official, who has identified himself as such, or is otherwise reasonably identifiable as such, issued under circumstances where it is reasonable to believe that the order is

> necessary to allow public safety officials to address a situation that
> threatens the public health, safety, or welfare ….

Defendants argue that the body-worn camera footage "clearly shows at minimum, that Defendants could reasonably believe that [Johnson] committed disorderly conduct" by attempting to proceed through a crime scene. [Dkt. 110 at 5.] They characterize the video as showing that Johnson "became angry, belligerent, yelled profanities and racial slurs toward officers, and voiced his disagreement with officers' orders," and "[b]ased on [his] refusals, Defendants reasonably believed that [Johnson] was going to further enter into the scene." [*Id.*] Defendants cite *Thayer v. Chiczewski* for the proposition that police have probable cause to arrest as soon as a suspect "fail[s] to follow their orders"; they "did not have to wait for [Johnson] to actually [cross] the police line." 705 F.3d 237, 250 (7th Cir. 2012).

Johnson argues that a jury must decide this claim because there are material disputes regarding his intention to enter the crime scene and the reasonableness of the officers' inferences. [Dkt. 122 at 6.][5] He argues that his statement that he was "going the other way" in context could only have referred to the crime scene, meaning that he did not intend to enter the crime scene. [Dkt. 122 at 6.] Johnson also argues that *Thayer* is distinguishable because "[o]ne individual walking home, alone, on a quiet residential street is not comparable to a disturbance of fifty protesters marching on a crowded downtown intersection" and because "unlike the plaintiffs in *Thayer*,

---

[5] Some of these disputes relate to later testimony Johnson argues is inconsistent. [Dkt. 122 at 6.] As the Court has explained, however, probable cause is an objective inquiry, so even if later testimony is contradictory, it does not impact whether probable cause existed, and the body-worn camera footage provides a clear record of the events at issue here, making credibility determinations as to later testimony immaterial.

Johnson complied with Officer Balasz's order not to cross the crime scene tape immediately before his arrest." [*Id.*]

The probable cause question a close one, and the Court is mindful that it must not usurp the jury's role as the factfinder. While Defendants' interpretation of the video may be persuasive, it is difficult to say that "the video is so definitive that there could be no reasonable disagreement about what the video depicts." *Kailin*, 77 F.4th at 481 (citation omitted). Even if a jury could find that Defendants lacked probable cause to arrest Johnson, however, the undisputed facts establish that Defendants had *arguable* probable cause to believe that Johnson was committing disorderly conduct.

*Thayer* establishes that police need not wait for a suspect to "break through [a] police line" to have probable cause to arrest for disorderly conduct, at least in some circumstances. 705 F.3d at 250. Here, after Johnson was told in no uncertain terms to walk a different way, he gave mixed signals about whether he would comply with that order. He said that he was not going toward the crime scene, but then he said, "I'm gonna check you bitches in the door before I go, so I ain't trying to go that way, brother." [Dkt. 125 (fifth link) at 0:45–1:18.] A reasonable officer could have believed that Johnson was refusing the order and that, in light of *Thayer*, there was probable cause that he was violating Chicago Municipal Code § 8-4-010. Because "a reasonable officer in the same circumstances and possessing the same knowledge as [Defendants] could have reasonably believed that probable cause existed in light of well-established law," the Court cannot say that officers violated a clearly established constitutional right. *Mwangangi*, 48 F.4th at 825 (quotation omitted). Johnson cites

no case that could lead the Court to a different conclusion [*cf.* Dkt. 122 at 16 (arguing only that "material factual disputes regarding … probable cause to arrest")], so he has not defeated qualified immunity, *see Taylor*, 10 F.4th at 806. Defendants are therefore entitled to summary judgment on Johnson's false arrest claim.

### B. State-Created Danger

Count II alleges that Hecker and Mata violated § 1983 by exposing Johnson to a state-created danger when they failed to apply Johnson's seatbelt while knowing he was handcuffed and had no way to brace himself against sudden movements of the car. [Dkt. 91 ¶¶ 23–38.] Defendants argue that Hecker and Mata are entitled to summary judgment [Dkt. 110 at 6], and the Court agrees.

The state-created danger doctrine is an exception to the general rule that the Due Process Clause of the Fourteenth Amendment "confers no affirmative right to governmental aid." *Est. of Her v. Hoeppner*, 939 F.3d 872, 875 (7th Cir. 2019) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989)). Under this doctrine, a plaintiff can establish a due process violation by proving that "(1) the government, by its affirmative acts, created or increased a danger to the plaintiff; (2) the government's failure to protect against the danger caused the plaintiff's injury; and (3) the conduct in question 'shocks the conscience.'" *Id.* at 876 (quotation omitted). "[C]onscience-shocking conduct … requires a culpable state of mind equivalent to deliberate indifference" or "criminal recklessness"; "mere negligence is categorically beneath the threshold of constitutional due process." *Id.* at 876–77 (cleaned up).

Defendants argue that Johnson's claim fails on the first and third elements [Dkt. 110 at 6–8], but the Court addresses only whether a reasonable jury could find

that Hecker's and Mata's conduct shocks the conscience.[6] It could not. The video shows that Johnson told the police not to "put [their] hands on [him]" or "push [him in there"; that he was "going to get in"; that they should "let [him] get in"; and that he could "get in right." [Dkt. 125 (fifth link) at 2:00–3:32.] When Mata attempted to fasten his seatbelt, he said, "I don't need it," "hell no," and "get that shit off." [*Id.*; *see* Dkt. 106 ¶ 22; Dkt. 123 ¶ 22 (disputing other facts but not Johnson's refusal).] Even setting aside the adamance of Johnson's refusals, permitting an adult to ride in a car without a seatbelt, even while handcuffed, is not the sort of "egregious conduct" required to shock the conscience under Seventh Circuit precedent. *See Est. of Her*, 939 F.3d at 876 (cleaned up); *cf. McDowell v. Village of Lansing*, 763 F.3d 762, 765– 67 (7th Cir. 2014) (holding that ordering a man to lie on the ground while three others who had been chasing him remained unsecure and one kicked him in the face could not be found to shock the conscience). A reasonable jury could find that Mata and Hecker were negligent for not insisting that Johnson wear a seatbelt or not making more of an effort to fasten his seatbelt, but negligence is insufficient for a § 1983 due process claim. *Est. of Her*, 939 F.3d at 877.

---

[6]     Defendants argue that there was no affirmative act because Mata simply failed to fasten Johnson's seatbelt—an omission, not an affirmative act. [Dkt. 110 at 6–7.] *See Doe v. Village of Arlington Heights*, 782 F.3d 911, 917–18 (7th Cir. 2015) (discussing when officers' conduct may give rise to a state-created danger). Johnson responds that by placing him in the car without a seatbelt, Defendants affirmatively exposed him to a danger he would not otherwise have faced. [Dkt. 122 at 8–9.] This appears to be a delicate line-drawing exercise: if Defendants' relevant conduct was "placing Johnson in the car without a seatbelt," there may have been an affirmative act; if the conduct in question was "failing to fasten Johnson's seatbelt," perhaps there was no affirmative act. The Court can resolve this claim on the shocks-the-conscience element, however, so it declines to decide whether there was an affirmative act here.

Johnson argues that a jury could find that Hecker's and Mata's conduct shocks the conscience based on five facts: (1) they "were disciplined for their conduct"; (2) that conduct violated CPD policy; (3) they "intentionally transported Johnson without a seatbelt"; (4) Hecker drove through stop signs and failed to stop at red lights despite knowing Johnson was unsecured; and (5) Hecker slammed on the brakes, causing Johnson to hit his head. [Dkt. 122 at 10 (citations omitted).] The Court cannot agree.

Regarding points (1) and (2), Defendants note the well-established principle that "§ 1983 protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices." *Est. of Biegert ex rel. Biegert v. Molitor*, 968 F.3d 693, 699 (7th Cir. 2020) (cleaned up). They argue that "[t]he introduction of evidence relating to any alleged violation of municipal regulations is improper" [Dkt. 129 at 8], but the Court is not convinced that the principle stretches that far. True, violations of policy often shed no light on whether a use of force is reasonable under the Fourth Amendment's objective standard. *See, e.g.*, *Est. of Biegert*, 968 F.3d at 699. But whether conduct shocks the conscience implicates a defendant's intent because the standard is deliberate indifference. *Est. of Her*, 939 F.3d at 876. The fact that the deliberate indifference standard applies suggests that policy violations could be relevant if they allowed a jury to infer that the failure to abide by policy was intentional. *Cf. United States v. Proano*, 912 F.3d 431, 439 (7th Cir. 2019) ("We have before recognized that evidence of departmental policies can be relevant to show intent in [18 U.S.C.] § 242 cases. ... Those decisions, expressly or impliedly, acknowledge that an officer's training can help inform his

state of mind in certain circumstances." (citations omitted)).[7] Here, though, the existence of policy violations does not preclude summary judgment because it is undisputed that Johnson refused the seatbelt. Therefore, a reasonable jury could not infer that Mata or Hecker intentionally or recklessly disregarded Johnson's safety based on their failure to follow CPD policy.

Points (4) and (5) are not relevant. The question for purposes of the failure to protect claim is whether allowing Johnson to ride without a seatbelt shocked the conscience, so the Court must analyze Hecker's and Mata's conduct at the time they took that action. Deciding whether Hecker drove poorly—and whether he did so intentionally, recklessly, or negligently—would not help a jury decide whether Mata's choice not to seatbelt Johnson or Hecker's failure to step in was based on deliberate indifference to a serious danger, *see Est. of Her*, 939 F.3d at 876, at least without evidence that they planned to leave Johnson vulnerable to injury in the back seat. Johnson cites no such evidence.[8]

That leaves point (3), that Mata and Hecker transported Johnson when he was not secured with a seatbelt, which simply restates the factual predicate for his claim. For the reasons stated above, it does not shock the conscience for police officers to transport a handcuffed arrestee without a seatbelt, at least where the arrestee

---

[7]  *Proano* distinguished Fourth Amendment cases because, among other reasons, "§ 1983, unlike § 242, is a civil statute that lacks a specific-intent requirement," but the discussion also makes clear that evidence may be relevant in some § 1983 cases. 912 F.3d at 439 (citation omitted); *see Florek v. Village of Mundelein*, 649 F.3d 594, 601–03 (7th Cir. 2011) (addressing the admissibility of expert testimony regarding police policies).

[8]  But if Hecker drove with the intent to injure Johnson or with a reckless disregard for Johnson's safety, Hecker may be liable on Johnson's excessive force claim, addressed below.

refuses a seatbelt. Accordingly, Mata and Hecker are entitled to summary judgment on Johnson's state-created danger claim.[9]

## C.   Excessive Force

In Count III, Johnson alleges that Hecker used excessive force in violation of the Fourth Amendment while transporting him to the police station. [Dkt. 91 ¶¶ 39–46.] Specifically, Johnson alleges that Hecker "intentionally came to a sudden stop," causing him "to lurch forward, bashing his head on the squad car's interior metal and plastic." [*Id.* ¶ 42.] The use of excessive force by police is an unreasonable seizure under the Fourth Amendment. *See Graham v. Connor*, 490 U.S. 386, 394 (1989).

> Whether the amount of force an officer used is excessive or reasonable turns on the "facts and circumstances of each particular case." The standard of reasonableness for a police officer in an excessive force case is "an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."

*Burton v. City of Zion*, 901 F.3d 772, 777 (7th Cir. 2018) (cleaned up) (quoting *Graham*, 490 U.S. at 396–97). Defendants argue that Hecker is entitled to summary judgment because his driving was objectively reasonable or, in the alternative, his conduct did not violate clearly established law. [Dkt. 110 at 9–10, 15–16.]

Defendants' merits briefing is somewhat off topic. They cite the Fourth Amendment's objective reasonableness standard at a high level, then turn to the

---

[9]     Johnson also argues that two cases Defendants cite, *Fluker v. County of Kankakee*, 945 F. Supp. 2d 972 (C.D. Ill. 2013), and *Young v. Department of Corrections*, 2007 WL 2214520 (E.D. Mich. July 27, 2007), are distinguishable. [Dkt. 122 at 10.] Because the Court has not relied on these cases, it does not address these arguments, except to note that a state-created danger claim arises under the Fourteenth Amendment, not the Fourth Amendment, and it incorporates a standard similar to Eighth Amendment deliberate indifference. *See Est. of Her*, 939 F.3d at 875–76. [*Contra* Dkt. 122 at 10.]

admittedly "higher standard" for deliberate indifference claims under the Eighth Amendment. [*Id.* at 10.] While sometimes reasoning by analogy to another body of law is helpful, Eighth Amendment jurisprudence is a poor analytical fit for Fourth Amendment claims. The former has both subjective and objective components, *see Balle v. Kennedy*, 73 F.3d 545, 552–53 (7th Cir. 2023), and Eighth Amendment claims are routinely rejected when a plaintiff lacks evidence that the defendant subjectively knew about the danger to the plaintiff, even if an reasonable official in his position would have known, *e.g.*, *Est. of Simpson v. Gorbett*, 863 F.3d 740, 747 (7th Cir. 2017) ("The rule is that an official who should have, but failed, to perceive a significant risk cannot be held liable." (citation omitted)). But the Fourth Amendment's excessive force standard is objective, imposing liability when a reasonable official would have known that the force in question was unreasonable, regardless of the defendant's subjective belief. *Burton*, 901 F.3d at 777. So Defendants are incorrect that "[a]bsent evidence to support that Hecker Jr. intended to punish [Johnson], or that he knowingly or purposefully took an action to harm [Johnson], the claim fails." [Dkt. 110 at 9 (citation omitted).] The question is whether his actions were "objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Burton*, 901 F.3d at 777 (cleaned up).[10]

---

[10]    Defendants' reliance on *Scott v. City of Philadelphia*, 2019 WL 3530909 (E.D. Pa. Aug. 1, 2019) [Dkt. 110 at 9], illustrates the twofold peril of citing out-of-circuit caselaw applying to different factual circumstances. *Scott* involved an excessive force claim by a pretrial detainee, which is governed by the Fourteenth Amendment's Due Process Clause, not the Fourth or Eighth Amendment. *See Jump v. Village of Shorewood*, 42 F.4th 782, 792–93 (7th Cir. 2022) (explaining when each Amendment applies). That might not be a problem had *Scott* arisen in the Seventh Circuit, which applies the objective reasonableness test to both

The Court is also skeptical of Defendants' implicit argument that no reasonable jury could conclude that Hecker's driving was unreasonable considering the in-car camera footage [Dkt. 110 at 9–10.] At minimum, the fuzzy video leaves much open to interpretation, *cf. Kailin*, 77 F.4th at 480–81. Their arguments might convince a jury that "slowing down and braking as [Hecker] approached the intersection of 75th Street and Vincennes[ ] was objectively reasonable" [Dkt. 110 at 10], but the camera (of course) does not capture Hecker's thoughts when he braked. It is not "so definitive that there could be no reasonable disagreement about [whether] the video depicts" a reasonable decision to stop before a busy intersection or an attempt to jostle an aggravating passenger. *See Kailin*, 77 F.4th at 481 (citation omitted). [Dkt. 122 at 11–12 (arguing that a jury could rely on Hecker's earlier speeding and rolling through stop signs and red lights to conclude that he "intentionally chose to brake with force").] If the outcome of Johnson's excessive force claim hinged on whether Hecker's actions were reasonable, a jury would need to decide that question.

But uncertainty of the merits aside, Defendants prevail on qualified immunity. Johnson cites the correct standard, noting the need for a factually analogous case or obviously unconstitutional conduct [Dkt. 122 at 14–15], but he makes little attempt

---

Fourth and Fourteenth Amendment claims, *see id.* at 793, but the Third Circuit applies the deliberate indifference standard to Fourteenth Amendment claims by pretrial detainees, *Scott*, 2019 WL 3530909, at *2 (citing *Edwards v. Northampton County*, 663 F. App'x 132, 135 (3d Cir. 2016) (per curiam)). *Scott* dismissed the claims against the officers transporting the plaintiff detainee because he had not alleged facts showing that the defendants were subjectively aware of a danger to him, not because an objectively reasonable officer could have driven as the defendants did. *Cf. id.* at *3 ("[W]here the plaintiff's allegations of reckless driving are coupled with allegations that the driver intended harm, refused to slow down after being asked, or declined to fasten an inmate's seatbelt despite the inmate's protestations, courts have found a basis for a constitutional claim." (citations omitted)).

to meet his burden under that standard. *See Taylor*, 10 F.4th at 806. He asserts that "the Northern District of Illinois has declared qualified immunity a poor defense for § 1983 actions at summary judgment where 'the parties differ materially as to the circumstances that confronted the official,'" and argues that his brief's discussion of the factual disputes as to the merits makes qualified immunity inappropriate at this stage. [*Id.* at 15 (quoting *Morgan v. Stringer*, 945 F. Supp. 1129, 1133 (N.D. Ill. 1996)).] He adds that "[c]ourts have precluded [the] qualified immunity defense on … excessive force claims at the summary judgment stage," citing *Levan v. George*, 604 F.3d 366 (7th Cir. 2010), as an example. [Dkt. 122 at 15.] He submits that like in *Levan*, "here there are material disputes regarding" Hecker's "use of excessive force," so "the Court should reserve these disputes for the trier of fact[ ]." [*Id.* at 16.]

This approach to qualified immunity will not do. The Supreme Court has made plain that "[s]pecificity is especially important in the Fourth Amendment context" because "[u]se of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152–53 (2018) (per curiam) (cleaned up). Analyzing whether existing precedent puts the legality of an officer's conduct beyond debate "is a necessary part of the qualified-immunity standard." *Id.* at 1153. True, sometimes factual disputes will preclude granting qualified immunity on the summary judgment record, *cf., e.g.*, *Smith*, 10 F.4th at 746–49, but that does not obviate the need for a plaintiff to furnish the legal basis upon which to deny qualified

immunity—caselaw on point or an obvious violation of the Constitution, *see Stockton*, 44 F.4th at 620–61. Johnson has not done so; therefore, he has not carried his burden of defeating qualified immunity. *See Taylor*, 10 F.4th at 806. Hecker is entitled to summary judgment on Johnson's excessive force claim.

### D. Failure to Provide Medical Care

Johnson's last § 1983 claim, Count IV, alleges that Edwards and Hecker failed to provide him adequate medical care despite an obvious need for medical treatment. [Dkt. 91 ¶¶ 47–56.] Because the alleged failure to provide adequate medical care occurred before a judicial probable cause determination, the Fourth Amendment governs this claim. *Braun*, 56 F.4th at 551. The Court "ask[s] whether the officer's conduct was objectively unreasonable under the circumstances," considering the following factors: "(1) whether the officer had notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigative concerns." *Id.* (cleaned up). Additionally, the objectively unreasonable conduct must cause the plaintiff's injury. *See Ortiz v. City of Chicago*, 656 F.3d 523, 534 (7th Cir. 2011). The Court disagrees with some of Defendants' framing of this claim, but it agrees that Edwards and Hecker are entitled to summary judgment. [*See* Dkt. 10–12.][11]

---

[11]     Defendants argue that (1) a claim for "denial" of medical care necessarily fails when the plaintiff receives medical care and (2) a plaintiff must have an "objectively serious" medical need to maintain a Fourth Amendment claim failure to provide medical care. [Dkt. 110 at 10–12.] The former seems not to conform with Seventh Circuit precedent, which frames the inquiry as "whether police violated [Johnson's] constitutional rights by failing to respond reasonably to [his] medical needs." *Florek v. Village of Mundelein*, 649 F.3d 594, 599 (7th Cir. 2011). The latter is another inapt analogy to Eighth Amendment jurisprudence,

In light of the video evidence, no reasonable jury could conclude that Johnson suffered any harm because of an unreasonable failure to provide medical care. *See Kailin*, 77 F.4th at 481. A jury could not find that much, if any, of Edwards's or Hecker's conduct was objectively unreasonable. After Hecker braked suddenly, Johnson cried out and soon fell silent. [Dkt. 125 (seventh link) at 45:13.] Hecker continued driving and reached the police station two and a half minutes later; he parked the car roughly 30 seconds after that. [Dkt. 106 ¶ 33; Dkt. 123 ¶ 33; Dkt. 125 (seventh link) at 47:37–48:15.] Less than a minute after parking, Hecker attempted to remove Johnson from the car and noticed that he appeared to be unconscious. [Dkt. 125 (seventh link) at 49:00.] Under a minute later, someone indicated that Johnson would need to be taken to the hospital. [*Id.* at 49:42; *see* Dkt. 106 ¶ 38; Dkt. 123 ¶ 38.] In short, Edwards and Hecker acted approximately as quickly as the Seventh Circuit held was a reasonable time to respond after discovering a detainee hanging in a cell. *See Pulera v. Sarzant*, 966 F.3d 540, 555 (7th Cir. 2020) (noting that the defendants "had the pressure off [the detainee's] neck in less than two minutes, and summoned an ambulance in less than five"). No reasonable factfinder could find Edwards's or Hecker's similar conduct constitutionally infirm.

Johnson's counterarguments are unconvincing. First, he suggests that Edwards and Hecker needed to act "immediately" [Dkt. 122 at 12–13], but Seventh

---

which requires showing "an objectively serious medical condition," *Brown v. LaVoie*, 90 F.4th 1206, 1212 (7th Cir. 2024) (quotation omitted), whereas the Fourth Amendment standard depends on the totality of the circumstances; while "the seriousness of the medical need" is relevant, "[o]ne should not fixate on factors," *Florek*, 649 F.3d at 600 (quotation omitted).

Circuit precedent squarely forecloses that argument. *Pulera*, 966 F.3d at 555 ("The Fourth Amendment requires reasonableness, not immediacy." (quotation omitted)).

Next, he argues that Edwards and Hecker acted unreasonably by "fail[ing] to check on the unconscious [Johnson] until they arrived at the police station, *minutes* after they heard him hit the plexiglass divider." [Dkt. 122 at 13.] But the Constitution does not demand an officer put himself at risk when there is a reasonable alternative. *Cf. Pulera*, 966 F.3d at 555–56 ("Perhaps the officers could have acted faster, but the Constitution does not demand perfection. Nor does it demand that a correctional officer enter a potentially dangerous situation before back-up can arrive." (citations omitted)). It could have been dangerous to park on the side of the street in the early hours of the morning, and Johnson does not suggest how stopping would have helped matters; would medical help have been summoned and arrived faster? With the police station so near, a reasonable officer could have concluded that the best course was to check on Johnson once there. It is improper to rely on a "hindsight-laden assessment of … officers' actions" when assessing their constitutionality. *Id.* at 555. Even assuming that Johnson's proposal would have improved the quality of care he received, the corresponding negative impact on the police's interest in officer safety would outweigh any benefit, meaning that a reasonable jury could not find Edwards's and Hecker's conduct unreasonable. *See Braun*, 56 F.4th at 551; *cf., e.g.*, *United States v. Salazar*, 69 F.4th 474, 477 (7th Cir. 2023) (explaining, in another context, that the Fourth Amendment recognizes an interest in officer safety).

Johnson also cites *Kudla v. City of Hammond*, 2022 WL 2171229, at \*5 (N.D. Ind. June 16, 2022), for the proposition that "[i]n the case where an arrestee loses consciousness, a reasonable response includes observing them, checking their breathing and pulse, calling an ambulance, rubbing their sternum, and removing their handcuffs." [Dkt. 122 at 12.] But *Kudla* does not support Johnson's position. There, the court held that taking those actions constituted reasonable medical care under the circumstances, but it did not suggest that they were required by the Constitution. 2022 WL 2171229, at \*5. In fact, *Kudla* recognized that "[t]he Fourth Amendment requires reasonableness, not immediacy," *id.* (quoting *Pulera*, 966 F.3d at 555), and that "[p]romptly calling an ambulance after being notified of an arrestee's medical need 'will typically qualify as reasonable,'" *id.* (quoting *Florek*, 649 F.3d at 601)). That is, in effect, what happened here: first responders arrived to provide medical care a mere six minutes after the medical need was identified and 13 minutes after the initial injury. [*See* Dkt. 125 (third link, ninth link) (body-worn camera footage time stamps 08:17:41, 08:24:57, 08:30:00).]

The Court has yet to discuss the most fundamental problem with Johnson's arguments about the reasonableness of Edwards's and Heckers's actions: Johnson complains about a delay in medical treatment, not an outright denial, but he does not explain how any delay harmed him. *See Jackson v. Sheriff of Winnebago Cnty.*, 74 F.4th 496, 500 (7th Cir. 2023) (explaining that a claim based on delayed medical care requires the plaintiff to "show the delay itself caused some degree of harm" (cleaned up)). Johnson regained consciousness in the police car before first responders arrived,

and he received medical attention. Johnson cites evidence about injuries he sustained as a result of hitting his head [Dkt. 122 at 3–4], but he cites no evidence and offers no argument to show that these injuries were caused or exacerbated by any delay in treatment, as opposed to the initial impact. Therefore, even if a jury could find that Edwards or Hecker unreasonably delayed providing medical care, Johnson's claim would still fail on causation grounds. *See Jackson*, 74 F.4th at 500. Edwards and Hecker are entitled to summary judgment on this claim.

## IV.  State Law Malicious Prosecution

Finally, Count V is a claim for malicious prosecution under Illinois law. [Dkt. 91 ¶¶ 57–60.] Success on a malicious prosecution claim requires a plaintiff to prove: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Moran v. Calumet City*, 54 F.4th 483, 499 (7th Cir. 2022) (quoting *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996)). Defendants raise several arguments; the Court focuses on malice.[12]

"Malice, as an element of malicious prosecution, has been defined as the initiation of a prosecution for an improper motive," meaning "any reason other than

---

[12] Because the Court grants summary judgment on Johnson's federal claims, it could relinquish supplemental jurisdiction over this claim. *See Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 461 (7th Cir. 2020) (noting that doing so is the typical practice). No party asks the Court to relinquish supplemental jurisdiction, however, and the Court exercises its discretion to retain jurisdiction. The parties have devoted substantial resources to litigating this claim before this Court, so judicial economy and efficiency counsel in favor of resolving the state law claim now; additionally, the outcome on the state law claim is clear. *See id.*

to bring the responsible party to justice." *Beaman v. Freesmeyer*, 183 N.E.3d 767, 792 (Ill. 2021) (citations omitted). Johnson accurately notes that under Illinois law, malice can be inferred from an absence of probable cause; he argues that because a jury could find that Defendants lacked probable cause to arrest him, the jury could also find that Defendants acted with malice. [Dkt. 122 at 14.] *See Beaman*, 183 N.E.3d at 792. Inferring malice from the absence of probable cause is not automatic, however. Such an inference is proper "when the circumstances are inconsistent with [the defendants acting in] good faith … and lack of probable cause has been clearly proved." *Beaman*, 183 N.E.3d at 792 (citations omitted). [*See* Dkt. 129 at 13–14.] Whether to infer malice from a lack of probable cause is a question of fact that will typically be for the jury, but a plaintiff must still "come forward … with evidence that would … permit a reasonable inference of malice." *Williams v. City of Chicago*, 733 F.3d 749, 760 (7th Cir. 2013) (emphasis omitted) (cited with approval by *Beamon*, 183 N.E.3d at 792).

Here, the Court's conclusion that Defendants had arguable probable cause to arrest Johnson combined with the lack of other evidence forecloses a finding of malice. [*Contra* Dkt. 122 at 14 (arguing that the absence of probable cause alone permits that finding).] At summary judgment, Johnson is "not required to 'clearly prove' the lack of probable cause or to come forward with evidence that would *require* the court to infer malice," *Williams*, 733 F.3d at 760, but under Illinois law there must be evidence that the defendant did not act in good faith in pursuing the prosecution, *see, e.g.*, *Mack v. First Sec. Bank of Chi.*, 511 N.E.2d 714, 718 (Ill. App. Ct. 1987) ("Unless the circumstances of the prosecution are inconsistent with good faith on the part of the

26

prosecutor, malice may not be inferred." (citations omitted)); 54 C.J.S. Malicious Prosecution § 57 (Aug. 2023 update) ("A lack of probable cause in bringing the underlying action is a factor that may be considered in determining if the claim was prosecuted with malice, since the lack of probable cause tends to show that the accuser did not believe in the guilt of the accused, but the lack of probable cause must be supplemented by other, additional evidence." (footnotes omitted) (treatise cited with approval by *Beamon*, 183 N.E.3d at 793)).

Defendants had arguable probable cause, so almost by definition their actions were consistent with good faith. *See Mwangangi*, 48 F.4th at 825 (defining the term to mean "that a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law" (cleaned up)); *cf. Williams*, 733 F.3d at 758 (concluding that disputes of fact precluded even a finding of arguable probable cause).[13] The presence of arguable probable cause does not mean that a jury would necessarily find that Defendants acted in good faith; at summary judgment, Johnson need only introduce evidence that would permit a jury to find in his favor. *See*

---

[13] The district court cases Johnson cites are likewise consistent with the Court's reading of Illinois law. [Dkt. 122 at 14.] In *Bolden v. Pesavento*, the court denied a motion for judgment as a matter of law following a jury verdict in the plaintiff's favor where "[t]he jury heard evidence that Defendants sought to bring someone other than the responsible party to justice. A jury could construe the testimony about the lineup as evidence of malice, too. … Bolden also offered evidence, including expert testimony, that Defendants repeatedly acted in ways contrary to their training and inconsistent with generally applicable police standards." 623 F. Supp. 3d 897, 925–26 (N.D. Ill. 2022). In *Jones-Huff v. Hill*, a summary judgment decision, the defendant argued only that the plaintiff's malicious prosecution claim failed because probable cause existed; when the court found a triable issue on probable cause, the motion for summary judgment on the malicious prosecution claim necessarily failed. 208 F. Supp. 3d 912, 924 (N.D. Ill. 2016).

*Williams*, 733 F.3d at 760 (explaining that the district court erred by requiring the plaintiff to "clearly prove" the absence of probable cause). But Johnson points to no evidence besides the lack of probable cause. [Dkt. 122 at 14; *cf*. Dkt. 106 ¶¶ 48, 50; Dkt. 123 ¶¶ 48, 50 (undisputed that Defendants did not know Johnson before their encounter on April 21, 2019 and deemed admitted that Defendants did not speak with prosecutors about the criminal case).] Because police officers who arrest based on arguable probable cause act consistently with good faith, *cf. Mwangangi*, 48 F.4th at 825, Johnson cannot rely on his arrest alone to prove malice, *see Mack*, 511 N.E.2d at 718; 54 C.J.S. Malicious Prosecution § 57. Johnson has come forward with no other evidence of malice, so Defendants are entitled to summary judgment on his malicious prosecution claim.

## V.  Conclusion

For the foregoing reasons, Defendants' motion for summary judgment [Dkt. 104] is granted. Judgment shall enter in favor of Defendants and against Johnson. Civil case terminated.

Enter: 21-cv-738
Date:  March 14, 2024

_____

Lindsay C. Jenkins
United States District Judge

28